**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------X
ALICIA SOTO,

                Plaintiff,                **REPORT & RECOMMENDATION**

    -against-                   09-CV-00457 (SLT) (RER)

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.
--------------------------------------------------X

**RAMON E. REYES, JR., U.S.M.J.:**


On January 28, 2009, Alicia Soto ("Soto") brought this action *pro se* pursuant to 42

U.S.C. §§ 405(g), 1383(c)(3), seeking reversal of a final decision of the Commissioner of Social

Security ("the Commissioner") that her disability ceased as of June 6, 2005. (Dkt. 1.) August

24, 2009, the Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure. (Dkt. 13.) On January 5, 2010, Soto opposed the motion.

(Dkt. 15.) On April 9, 2010, the Honorable Sandra L. Townes referred the motion to me for a

report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. Entry, 4/9/2010.) For

the reasons stated below, I respectfully recommend that the Commissioner's motion be denied,

and that the matter be remanded for further proceedings consistent with this Recommendation.


## BACKGROUND

Soto is a 52-year -old Queens resident. (Dkt. 16, 17, Administrative Record ("R.") at

698.) She has a tenth-grade education, does not have a General Equivalency Diploma, and has

no prior work experience other than a four-day stint as a sales clerk at a curtain shop. (*Id*. at 654, 702–04.)

I. **Procedural History**

Soto applied for Supplemental Security Income ("SSI") on November 1, 1999, (*id*. at 121–23), indicating that she had "asthma, back problems, back disk out of place, heart pains . . . , [and] bad nerves," (*id*. at 131). The Commissioner initially denied her application, (*id*. at 47–50), but upon a hearing on April 4, 2002, Administrative Law Judge ("ALJ") Leonard E. Yoswein determined that Soto had a disability because her depression met the clinical criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listing"), (*id*. at 494–98). On August 20, 2002, the Appeals Council remanded the ALJ's decision for further development of the record, (*id*. at 502–05), and on November 20, 2002, ALJ Yoswein found again that Soto's depression constituted a disability, (*id*. at 34–38).

In 2005, as a result of Soto's continuing disability review, the Commissioner determined that she had experienced medical improvement and was no longer disabled, (*id*. at 43–46, 92–96); this determination was affirmed on reconsideration, (*id*. at 107–20). Upon Soto's request, (*id*. at 534–36), ALJ Sol Wieselthier held a hearing on April 29, 2008 and found that as of June 6, 2005, Soto was no longer disabled, (*id*. at 16–22). The Appeals Council denied Soto's request for review, making the ALJ's decision final. (*Id*. at 9.) Thereafter, Soto commenced this action. (Dkt. 1.)

II. **Evidence Related to the Initial Disability Determination**

In his November 20, 2002 decision, ALJ Yoswein considered various records and other evidence, including (1) a report by Mi H. Lee, M.D., Soto's treating psychiatrist since 1999, (2) a

consultative examination report by Joshua Algaze, M.D., (3) testimony of a psychiatrist Rita

Clark, M.D., a medical expert, and (4) testimony of a vocational expert Pat Green.  (*Id.* at 34,

37–38.)  Soto did not attend the hearing, but was represented by counsel.  (*Id.* at 753.)

###   A.      Opinion of Soto's Treating Psychiatrist, Mi H. Lee, M.D.

In 2002, Dr. Lee diagnosed Soto with major depression, dysthymia[1] (depressive neurosis),

and generalized anxiety disorder.[2]  (*Id.* at 175.)  Dr. Lee noted that Soto's affect was "somewhat

blunted" and her mood was "anxious, withdrawn, [and] depressed," (*id.* at 178), and identified

such symptoms as "feeling anxious, on edge (all the time)," being restless, suffering from crying

spells, poor sleep, poor appetite, and severe headaches, (*id.* at 175).  Dr. Lee prescribed Soto

Buspar, a psychotropic medication.  (*Id.* at 175; *see id.* at 37.)

###   B.      Consultative Psychiatric Examination by Joshua Algaze, M.D.

Dr. Algaze examined Soto on April 24, 2000 and diagnosed her with "adjust reaction

with anxiety"[3] and disthymia on Axis I[4] (clinical disorders and other conditions that may be a

---

[1]  Dysthymia is "[a] disorder of the mood, less severe than a major depression, marked by a loss of interest in activities previously enjoyed, described by the patient as a feeling of being in the dumps, and lasting more than two years."  2-D Attorneys' Dictionary of Medicine D-37210 (2009).

[2]  Generalized anxiety disorder is "[a] mental disorder marked by excessive worry (and lasting six months or longer) about several (two or more) circumstances."  3-G Attorneys' Dictionary of Medicine G-49141.

[3]  Adjustment reaction is "[a] temporary personality disorder resulting from the reaction of the patient to an unpleasant event, emotional conflict, etc."  1-A Attorneys' Dictionary of Medicine A-3094.

[4]  Each axis in a multiaxial system of diagnosis "refers to a different domain of information that may help the clinician plan treatment and predict outcome."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR 27 (4th ed. 2004).

focus of clinical attention), personality disorder[5] on Axis II (personality disorders and mental

retardation), and chronic back pain on Axis III (general medical conditions). (*Id.* at 199.) Dr.

Algaze noted Soto's blunted affect and depressed and anxious mood, and identified such

symptoms as "frequent difficulties falling asleep," crying spells, "frequent feelings of low self-

esteem," and inability "to tolerate any conflict, or stress." (*Id.* at 198.) Dr. Algaze acknowledged

that Soto was receiving psychiatric treatment and taking Hydroxyzine[6] and Prozac[7] daily. (*Id.* at

198.) He recommended that Soto continue psychiatric therapy. (*Id.* at 199.)

### C.    Expert Testimony at the November 20, 2002 Hearing

#### 1)    Medical Expert Rita Clark, M.D. (Psychiatrist)

Dr. Clark testified that both the report of Soto's treating psychiatrist and the impartial

consultative examination established that Soto suffered from major depression meeting the

following medical criteria of Section 12.04(A)(1) of the Listing: anhedonia,[8] sleep disturbance,

psychomotor agitation,[9] decreased energy, feelings of worthlessness, and difficulty concentrating.

---

[5] Personality Disorders are "[d]isorders of character and the patterns of perceiving and relating to the environment and oneself, marked by inflexible traits that cause subjective (personal) distress and/or impairment in occupational or social functioning." 4-P Attorneys' Dictionary of Medicine P-90210.

[6] Hydroxyzine Hydrochloride is "[a] medicinal substance used as a mild tranquilizer, in anxiety, stress," and other conditions. 3-H Attorneys' Dictionary of Medicine H-56875.

[7] Prozac is "[t]he trademark name of a drug used as an antidepressant." 4-P Attorneys' Dictionary of Medicine P-96594.

[8] Anhedonia is "[a] marked decrease in the pleasure of living or of being alive; a loss of appreciation for activities which are normally pleasurable; the loss of emotional well-being; the inability to be happy, no matter what." 1-A Attorneys' Dictionary of Medicine A-7494.

[9] Psychomotor agitation is an "[i]ncreased and excessive motor activity, accompanied by a sense of agitation or tension." 4-P Attorneys' Dictionary of Medicine P-96994.

4

(*Id.* at 755–56.)  Dr. Clark also testified that these symptoms resulted in limitations identified in Section 12.04(B): "a marked restriction of activities of daily living,[10] a marked difficulty in maintaining social functioning[,] and marked deficiencies of concentration." (*Id.* at 756.)

### 2)     **Vocational Expert Pat Green**

Pat Green testified that Soto "[could not] work;" but did not elaborate. (*Id.* at 759.)  The ALJ stated that he did not ask the experts "too many questions or go into too much detail" because the AJL did not "feel that this case warrant[ed] it." (*Id.*)

Based on the foregoing evidence, the ALJ concluded that Soto's depression met the criteria of Section 12.04 of the Listing. (*Id.* at 38.)

### III.     **Evidence Related to the Determination That Soto's Disability Had Ceased**

In his June 5, 2008 determination, ALJ Wieselthier considered various records and other evidence, including (1) records and reports from the Wyckoff Heights Medical Center ("Wyckoff"), where Soto had received medical treatment, (2) consultative internal medicine examination report by Kautilya Puri, M.D., (3) consultative psychiatric evaluation and intelligence evaluation by Rochelle Sherman, Ph.D., (4) testimony of an impartial medical expert Gene L. Gitelle, M.D., (5) testimony of an impartial vocational expert Andrew Pasternak, and (6) Soto's testimony. (*Id.* at 16–22.)

---

[10]  "Activities of daily living" or "ADL" are "[t]he tasks necessary to care for oneself," such as "[b]athing, using the toilet, dressing, preparing simple meals, eating, and moving about." 1-A Attorneys' Dictionary of Medicine A-2122.

A.      **Records from the Wyckoff Heights Medical Center**

The administrative record contains Soto's medical records from Wyckoff from July 2003 through November 2004, (*id*. at 614–53), where Soto received treatment.[11]  (*Id*. at 707–08.)

Soto's September 24, 2004 radiographic examination[12] of the chest was normal because her "cardiovascular silhouette [was] within normal limits" and her "lung fields [were] clear." (*Id*. at 627.)  Progress notes on ambulatory care also do not identify any significant heart problems.  (*See, e.g.*, *id*. at 641 ("no cardiac problem at this time").)  An Ambulatory Surgery Chart History and Physical Exam, dated April 30, 2004, did not raise any issues with respect to Soto's respiratory or cardiovascular conditions.  (*Id.* at 638.)  An echocardiogram[13] performed on December 8, 2003, listing Soto's diagnosis as "dyspnea,"[14] noted Soto's normal left ventricular and valvular function.  (*Id.* at 648.)[15]

_____

[11]  The transcript of Soto's testimony at the April 29, 2008 hearing refers to "Whitecliff Hospital," which, based on the record and given that a hospital under such name does not exist in New York, is an apparent reference to Wyckoff.  (*See* R. at 707.)  Also, it is not clear when Soto stopped receiving treatment at Wyckoff because at the hearing in April, she said she had not been there "since May, six months ago."  (*Id.* at 708.)

[12]  Radiographic diagnostic procedure is "[a] procedure that utilizes x-ray technique and is intended to establish a diagnosis."  5-R Attorneys' Dictionary of Medicine R-98825.

[13]  Echocardiogram is "[a]n outline of the heart prepared by the use of ultrasound"— "a form of energy consisting of sound-like vibrations or waves of supersonic frequency, used to create a vibratory echo which is recorded (in the manner of radar)."  2-E Attorneys' Dictionary of Medicine E-37500.

[14]  Dyspnea is "[s]hortness of breath; labored breathing," which "[i]n most cases . . . is due to heart disease," but "in some instances . . is caused by kidney disease or lung disease."  2-D Attorneys' Dictionary of Medicine D-37171.

[15]  The records also indicate that Soto underwent a laparoscopic cholecystectomy in September 2004, (R. at 621–24), a fissure cone biopsy and cervical curettage in December 2003, (*id.* at 644–47), endocervix curettage and endometrium biopsy in November 2003, (*id.* at 651),

**B.     Consultative Examinations**

**1)     Internal Medicine Examination by Kautilya Puri, M.D.**

Dr. Puri examined Soto on April 14, 2005 and diagnosed her with: 1) "history of

depression with anxiety," 2) "low back pain," 3) asthma, 4) "history of leaky valve on EKG."[16]

(*Id*. at 659.)  Soto's chief complaint was her heart condition; apparently, she reported to Dr. Puri

that a recent examination in the emergency room of the Wyckoff Hospital had showed that Soto

had two leaky valves.  (*Id*. at 657.)  The records from the hospital, which were requested on

March 2, 2005 and printed by the hospital on March 10, 2005, do not support Soto's statement.

(*See id* at 614–53.)  Dr. Puri indicated that Soto "[did] not give any symptoms associated with"

Soto's report of a leaky valve.  (*Id.* at 657.)  Dr. Puri noted that Soto's heart rhythm was regular

and endocervix curettage in August 2003, (*id*. at 652).  Soto did not put these conditions at issue
either in her testimony or opposition to this motion, (*see id*. at 697–722), and the record does not
suggest that these procedures and conditions made Soto disabled as of June 6, 2005.

[16]  "Leaky valve" or valvular insufficiency, also referred to as valvular incompetence or
regurgitation, "occurs when a [heart] valve does not close tightly."  Heart Valve Disease,
http://www.webmd.com/heart-disease/guide/heart-valve-disease (last visited Aug. 23, 2010); *see
also* 6-V Attorneys' Dictionary of Medicine V-121826 (defining valvular incompetence as a
"condition of a heart valve in which it fails to close completely the opening it is intended to
control").

and her EKG[17] indicated "normal sinus rhythm with short PR interval"[18] and "[n]o symptoms associated with this."  (*Id*. at 658, 659.)

With respect to other health issues, apart from Soto's self-reported asthma, low back pain, and history of depression, Dr. Puri did not note any significant abnormalities.  (*Id.* at 657–61.) Dr. Puri diagnosed Soto with asthma, but found that Soto had no "objective limitations to communication, . . . fine or gross motor activities[,] . . . . gait or [activities of daily living]." (*Id.* at 659.)  With respect to Soto's mental status, Dr. Puri also found no abnormalities, noting Soto's "normal" affect and lack of evidence of hallucinations, delusions, suicidal ideation or impaired judgment or memory.  (*Id.*)  Dr. Puri recommended that Soto "not carry out any strenuous activities until cleared by [Soto's] physician per her . . . history."  (*Id*. at 659-60.)

### 2)      Radiology Examination by Pesbo S. Kovtal, M.D., Ph.D.

An X-ray of Soto's lumbar[19] sacral spine conducted on May 5, 2005, showed that Soto did not have any "bony or disc space pathology."  (*Id.* at 666.)

### 3)      Psychiatric Evaluation by Rochelle Sherman, Ph.D.

Following a consultative psychiatric evaluation on April 14, 2005, Dr. Sherman diagnosed Soto with anxiety disorder on Axis I, deferred diagnosis on Axis II, and noted history

---

[17] EKG is "[t]he abbreviation for electrocardiogram"—"[a] tracing or graph, usually recorded on a strip of photographic film, or a reprint thereof, which represents electric currents generated by the heart muscle as it works."  2-E Attorneys' Dictionary of Medicine E-38122, E-38271.

[18] In an EKG, P-R interval "represents the time it takes the impulse (activating the heartbeat) to travel from the sinoatrial node (where the impulse originates) to the ventricles (lower chambers of the heart)."  4-P Attorneys' Dictionary of Medicine P-94567.

[19] Lumbar part of spinal cord "is situated within the lower part of the spine (or vertebral canal)."  3-L Attorneys' Dictionary of Medicine L-69513.

of back pain on Axis III.  (*Id.* at 655.)  Dr. Sherman observed that Soto's "[a]ffect was full range and appropriate" and "[m]ood was neutral," noting that medical sources did not provide any "evidence of psychosis,[20] affective[21] or anxiety disorder."  (*Id.*)  Dr. Sherman concluded that Soto was "self[-]sufficient in terms of social skills and cognitive functioning."  (*Id.*)

### 4)  Intelligence Evaluation by Rochelle Sherman, Ph.D.

Dr. Sherman also administered a standardized intelligence scale test (Wechsler-III)[22] on May 5, 2005 and diagnosed Soto with mild mental retardation.[23]  (*Id.* at 664.)  On the test, Soto achieved a Full Scale IQ of 46, a Verbal Scale IQ of 55, and a Performance Scale IQ of 47, but Dr. Sherman noted in her report that Soto "did not seem to apply herself to the best of her abilities."  (*Id.* at 662, 663.)  Dr. Sherman opined that Soto "may have potential for higher functioning" based on Soto's "questionable motivation and a previous mental status evaluation." (*Id.* at 664.)  In Dr. Sherman's opinion, "[Soto's] overall level of intellectual functioning [was] within the very impaired range," but she "appear[ed] capable of higher functioning."  (*Id.*)

---

[20]  Psychosis means "1. A mental disorder in which the personality is seriously affected, being much more disorganized than in the case of a neurosis . . . . 2. Any type of insanity, especially schizophrenia. 3. Any severe emotional illness."  4-P Attorneys' Dictionary of Medicine P-97026.

[21]  Affective disorder is "[a]ny severe mental disorder marked by periods of extreme depression or elation."  1-A Attorneys' Dictionary of Medicine A-3549.

[22]  Wechsler adult intelligence test (or scale) (WAIS) is a standardized test "based on verbal and performance material which takes into consideration the age of the subject."  6-W Attorneys' Dictionary of Medicine W-124572, W-124573.

[23]  Mental retardation is "[a] condition in which the function of the intellect is below normal;" specifically, "a mild case is marked by an I.Q. of 52–67" (achieved on the Stanford-Binet test).  4-M Attorneys' Dictionary of Medicine M-73355.

### C.  Expert Testimony at the April 29, 2008 Hearing

#### 1)  Medical Expert Gene L. Gitelle, M.D.

Dr. Gene L. Gitelle testified that Soto did not have an impairment or a combination of impairments which met or medically equaled the severity of an impairment identified in the Listing ("Listed Impairment").  (*See id*. at 723.)  Dr. Gitelle opined that there may exist a connection between Soto's anxiety disorder and her leaky valve issue, as "there is often a relationship between [valve inadequacy] and anxiety or panic attacks."  (*Id.* at 722–23.)  Dr. Gitelle found that Soto's IQ of 46 and the suggestion of any mental defects was "absolutely not credible" because Soto appeared "even somewhat bright" and her activities of daily living were adequate.  (*Id.* at 722.)  Dr. Gitelle concluded that "there [was] no psychiatric issue except as secondary to the valve inadequacy."  (*Id.*)

#### 2)  Vocational Expert Andrew Pasternak

Andrew Pasternak testified that Soto could find and perform a variety of unskilled jobs at the light level, available both locally and in the national economy—for example, a hand packer (5,500 positions locally and 250,000 in the national economy) or a stamper or marker (3,000 jobs locally and 865,000 in the national economy).  (*Id*. at 725–26.)  The expert based his conclusion on Soto's testimony and the medical consultant's determination that there were no objective limitations to Soto's communication, motor activity or activities of daily living.  (*See id.* at 724–25.)  The expert's prior experience of working as a director of an agency for the developmentally disabled has led him to believe that, based on Soto's abilities, the result of her intelligence evaluation was not credible.  (*Id.* at 724.)

**E.      Soto's Testimony at the April 29, 2008 Hearing**

Despite the fact that the ALJ twice postponed the hearing to allow Soto to obtain counsel, and despite Soto's receipt of a letter from the Social Security Administration ("SSA") informing her how to obtain free or paid legal representation, (*id*. at 683–84, 686, 690), Soto was not represented by counsel at the April 29, 2008 hearing, (*id.* at 695).

The ALJ questioned Soto about her mental condition, and she testified that she felt "all right." (*Id.* at 705–06.)  She then broke into tears and explained that she "just hate[d] to take that medicine all the time," referring to aspirin, which she took for her heart condition.  (*Id.* at 706.) She stated that she did not see a physician or psychiatrist and had stopped receiving treatment at Wyckoff[24] six months prior to the hearing because the hospital no longer accepted her health insurance.  (*Id.* at 705, 707–08.)  Soto reported that she did not take any medication for depression, but took Ambien[25] to help her with her sleeping problems.  (*Id.* at 709, 719.)

As to her physical condition, when questioned about her leaky valve issue, Soto testified that she felt "good" approximately one time a week and weak and dizzy the rest of the time.  (*Id.* at 704–05.)  She reported that she took Atenolol[26] once or twice a month for her heart condition. (*Id.* at 706–07.)  When the ALJ asked Soto about her asthma, Soto answered that she felt "short

---

[24] *See supra* note 11.

[25]  Ambien is "[t]he trademark name of a drug used in the short-term treatment of insomnia."  1-A Attorneys' Dictionary of Medicine A-5446.

[26]  Atenolol is "[t]he generic name of a medicinal substance used in the treatment of hypertension."  1-A Attorneys' Dictionary of Medicine A-12002.

of breath" approximately four times a month and took the Proventil[27] spray for that condition. (*Id.* at 709–10.)

Soto testified that she would "get weakness in [her] legs" after walking a block or two, (*id.* at 710), and could only stand on her feet without sitting down for approximately half an hour, (*id.* at 710–11). Soto also testified that she felt dizzy when she bent down, numb in her knees when she knelt, and felt pain in her hands when she held or grasped things. (*Id.* at 711–12.) She stated that she felt "pain every day in [her] hands," for which she takes medicine. (*Id.* at 712.) According to Soto, the heaviest item she could lift was a quart of milk. (*Id.* 712–13.) Yet, Soto took the train by herself to attend the hearing and appeared unaccompanied, admitting that, apart from getting "tired of going up and down the stairs," she did not have any physical problems commuting. (*Id.* at 695, 701.)

With respect to her activities of daily living, Soto testified that she lived by herself on the second floor of a walk-up and had a dog. (*Id.* at 697, 699.) Every day, Soto read the Bible for approximately half an hour, watched TV, and listened to the radio. (*Id*. at 714–15, 720.) Every Sunday a van picked her up and took her to church, where she attended a three-hour service. (*Id.* at 716–17.) Once or twice a month she visited her sister, who lived a block away from Soto's apartment building. (*Id.* at 713.) Soto stated that her daughter came to Soto's apartment to do cooking and other housework. (*Id.* at 718–19, 720–21.) Once a month, Soto's daughter picked Soto up and drove her to Sears; Soto, however, would not "go all over the store," but "let her

---

[27] Proventil is "[t]he brand name of a preparation containing albuterol," 4-P Attorneys' Dictionary of Medicine P-96527—"[a] beta-adrenergic drug used as a bronchodilator (dilator of bronchial tubes) for the treatment of bronchospasm (spasm of bronchial tubes) in obstructive airway . . . disease." 1-A Attorneys' Dictionary of Medicine A-4199.

[daughter] walk around." (*Id.* at 713–14.)  Soto testified that she had a driver's license, but the last time she drove was one year prior to the hearing when she drove her daughter's car for about an hour.  (*Id.* at 700–01.)

Based on this evidence, the ALJ found that Soto had experienced medical improvement and she did not have a Listed Impairment.  (*Id.* at 18–22.)

## DISCUSSION

### I.     Applicable Legal Standards

#### A.     Standard of Review

42 U.S.C. § 1383(c)(3) governs judicial review of final decisions of the Commissioner and expressly incorporates the standards set forth in 42 U.S.C. § 405(g), which provides that a district court may review and affirm, reverse, or modify a final decision of the Commissioner, with or without remand.  42 U.S.C. §§ 405(g), 1383(c)(3).  Remand of a disability claim is warranted where new material evidence not previously presented before the SSA has been produced, the administrative record has gaps, or the ALJ failed to apply a proper legal standard. *Jeffcoat v. Astrue*, No. 09-CV-5276, 2010 WL 3154344, at *8 (E.D.N.Y. Aug. 06, 2010); *Caserto v. Barnhart*, 309 F.Supp. 2d 435, 444 (E.D.N.Y. 2004).

On judicial review, "[t]he findings of [the Commissioner] as to any fact, if supported by substantial evidence, [are] conclusive."  42 U.S.C. § 405(g).  As such, a court may set aside an SSI benefit determination only if (1) "the decision is based on [a] legal error" or (2) "the factual findings are not supported by 'substantial evidence.'" *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).  This means that a court must review the Commissioner's legal conclusions *de novo*,

but apply the deferential substantial evidence standard to the Commissioner's factual determinations. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *Wong v. Astrue*, No. 06-CV-2949, 2010 WL 1268059, at *7 (E.D.N.Y. Mar. 31, 2010).

Substantial evidence means "such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion." *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether substantial evidence supports the Commissioner's decision, a court must first ensure that the claimant has had a reasonable opportunity for a fair hearing. *See* 20 C.F.R. § 702.338; *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990). "[T]he reviewing court is [also] required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999) (citation and internal quotation marks omitted). However, if there is conflicting evidence in the record, "it is up to the [SSA], and not [a] court, to weigh" such evidence. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). "[W]hen evaluating the evidence, the reviewing court may not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon de novo review." *Kirby v. Astrue*, No. 07-CV-2768, 2009 WL 1974435, at *11 (E.D.N.Y. July 09, 2009) (relying on *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)). Accordingly, "[i]f the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position." *Batista v. Barnhart*, 326 F.Supp. 2d 345, 352 (E.D.N.Y. 2004) (citing *Jones,* 949 F.2d 57 at 59).

## B.        The ALJ's Duty to Develop the Record

Generally, the claimant has to prove that she is disabled and produce medical and other evidence of her medical impairment and its effect on her ability to work.  20 C.F.R. § 404.1512(a).  However, a hearing on SSI benefits is a non-adversarial proceeding.  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996); *Lahoz v. Astrue*, No. 09-CV-4523, 2010 WL 3310266, at *6 (E.D.N.Y. Aug. 19, 2010).  Accordingly, the ALJ has an affirmative duty to develop the claimant's complete medical history for at least the twelve-month period prior to the date that the claimant filed for disability. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d); *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 83 (2d Cir. 2009).  Such duty "includes advising the [claimant] of the importance of [] evidence [of the treating physician's opinion].  *Batista*, 326 F. Supp. 2d at 353.  In cases involving a *pro se* claimant, the ALJ has a duty "to scrupulously and conscientiously probe into . . . all the relevant facts."  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 509 (2d Cir. 2009) (citation and internal quotation marks omitted).

If the record is inadequate and does not allow the ALJ to determine whether the claimant is disabled, the ALJ has to "seek additional evidence or clarification" from the claimant's medical sources.  20 C.F.R. § 404.1512(e).  In the course of its review, the SSA may also ask the recipient "to attend one or more consultative examinations at [SSA's] expense," and reports of such examinations become part of the record.  20 C.F.R. § 404.1512(f), 404.1517– 404.1519t. "[W]here there are no gaps and deficiencies in the record that prevent the ALJ from making the disability determination and assessing the claimant's RFC [("Residual Functional Capacity")], the ALJ has met his obligation to develop the record."  *Peck v. Astrue*, No. 07-CV-3762, 2010 WL 3125950, at *8 (E.D.N.Y. Aug. 06, 2010).

C.    **The Treating Physician Rule**

Regarding medical opinion evidence, the ALJ must give more weight to: "(1) opinions provided by physicians who have actually examined a claimant; (2) opinions provided by a claimant[']s treating physicians; (3) opinions supported by objective relevant evidence; (4) opinions that are more consistent with the record evidence as a whole; (5) opinions of specialists about medical impairments related to their area of expertise; and (6) opinions that may be supported by any other factors the claimant brings to the Commissioner's attention." *Castano v. Astrue*, 650 F. Supp. 2d 270, 277 (E.D.N.Y. 2009) (citing 20 C.F.R. § 416.927(d)).

"A treating physician is defined as the claimant's own physician who has provided the individual with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." *Hilsdorf v. Comm'r of Soc. Sec.*, No. 08-CV-5290, 2010 WL 2836374, n. 4 (E.D.N.Y. July 15, 2010) (citations and internal quotation marks omitted).  The ALJ has to give a treating physician's opinion "controlling weight" if it (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with the other substantial evidence."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Burgess*, 537 F.3d at 128.  "If a treating physician's diagnosis is inconsistent with the rest of the record, the treating physician's opinion generally will not be given controlling weight." *Kirby v. Astrue*, 2009 WL 1974435, at *13 (relying on *Burgess*, 537 F.3d at 128).

III.    **The Commissioner's Motion Should be Denied**

Soto challenges only the ALJ's factual findings and does not argue that his decision is contrary to law.  (*See* Plaintiff's Affidavit/Affirmation in Opposition to Defendant's Motion ("Pl.

Opp."), dated Jan. 5, 2010, at 2.)  The ALJ ultimately determined that Soto's "disability ended on

June 6, 2005, and that [she] has not become disabled since that date."  (R. at 16)  In making his

decision, the ALJ explicitly followed the seven-step regulatory framework of 20 C.F.R. §

416.994, and concluded that as of June 5, 2005, (1) Soto did not have a Listed Impairment, (2)

she had experienced medical improvement, (3) such improvement was related to her ability to

work, (4) she has continued to suffer from a severe impairment, but had the RFC "to perform the

full range of light work as defined in" 20 C.F.R. § 416.967(b), and (5) based on Soto's RFC, age,

education, and prior work experience, "she has been able to perform a significant number of jobs

in the national economy."  (R. at 18–22.)

On first glance, the ALJ's decision appears to be supported by substantial evidence.  The

ALJ considered the medical records from the only treating medical provider Soto specifically

identified, Wyckoff.  (*Id.* at 614–53.)  The Wyckoff records from July 2003 through November

2004 do not show that Soto had a Listed Impairment or was otherwise disabled.  (*Id.*)

Additionally, objective medical evidence from the impartial medical consultants and experts,

provide ample support for the ALJ's determination that Soto's disability ceased in June 2005.

Nevertheless, the record appears to have significant gaps concerning Soto's mental health

treatment from 2002 through at least 2005.  Notably, the April 15, 2005 psychiatric evaluation

from Dr. Sherman indicates:

> There is no history of psychiatric treatment.  There is no history of
> psychiatric hospitalizations.  *The claimant reports that she receives
> out patient mental health treatment at a local mental health center
> and is presently taking psychotropic medication for anxiety*.  She
> did not bring medication to the evaluation and could not recall the
> name of the medication.  Records indicate that she may take
> Ambien at night.

(*Id.* at 654 (emphasis added)).  The notation that there is "no history of psychiatric treatment" but that Soto reported receiving outpatient mental health treatment and taking psychotropic medication at the time are at odds with one another.  Yet, the ALJ did not inquire into this issue beyond asking Soto whether she was currently seeing a psychiatrist in April 2008, three years after the consultive report was prepared.  As discussed above, an ALJ has a duty to develop the record, and in this instance the ALJ should have inquired further about Soto's mental health treatment from 2002 through 2005, including who provided the "mental health treatment" Soto identified to Dr. Sherman.  If that "local mental health center" was one other than Wyckoff,[28] the ALJ should have subpoenaed treatment records from the appropriate facility, and considered those documents before rendering a final decision.  This gap in the record is significant in light of Soto's current complaints: "My sickness and weakness of my heart, legs, arms, E.t.c. [sic] make me more depressed . . . . I feel sad and tired every day and have crying spells . . . . I fell [sic] disappointed and hopeless . . . I feel very depress[sic] at times."  (Pl. Opp. at 2.)  It appears from this that Soto is alleging disability not so much from her medical issues, but from the psychiatric effects resulting from those issues.

There are also gaps in the record concerning Soto's post-2004 medical treatment.  As discussed immediately above, the ALJ had before him the Wyckoff records from July 2003 through November 2004.  At the April 2008 hearing, the ALJ questioned Soto as to whether she currently received medical treatment, and she stated that she did not:

---

[28] The Wyckoff records indicate that the Commissioner requested, among other things, psychiatric records.  (R. at 615.)  No psychiatric records appear therein, however, suggesting that Soto did not receive mental health treatment from Wyckoff during the July 2003 through November 2004 period.  However, that does not mean that Soto did not receive such treatment elsewhere.

| | |
|---|---|
| Q | Where are you treating? |
| A | I was treated at the [Wyckoff] Hospital, but as soon as they took away the Medicaid and all I got—then they didn't send me there no more. |
| Q | Do you still go to [Wyckoff]? |
| A | Yes. |
| Q | How often? |
| A | I used to go like every month. |
| Q | Now? |
| A | No, I don't go because they don't accept my health plan. |
| Q | Excuse me? |
| A | Because they don't accept the plan, the health plan that I've got now. |
| Q | How long has it been since you've been there? |
| A | *I think it was since May, six months ago.* |
| Q | Where do you treat now? |
| A | Now I don't—I don't have a doctor to go to.   I don't have a doctor to go to. |
| Q | I'm sorry, what doctor do you see now? |
| A | I don't see no doctor now. |
| Q | *So for six months you've had no treatment?* |
| A | Yeah, because the doctor I was seeing he gave me enough medicine, and I have the little jar with me. |

(*Id*. at 707–08 (emphasis added)).  Thus, it is unclear precisely when Soto ceased being a patient

at Wyckoff or elsewhere.  It may have been six months prior to the hearing, in which case there

are medical records from November 2004 to the end of 2007 that were never made part of the record.  It is impossible to tell from the existing record.  Accordingly, it was incumbent upon the ALJ to inquire further into this issue.

Moreover, the ALJ never explained to Soto the importance of obtaining an opinion from her treating physician or mental health provider.  (*Id.* 695–728.)   It is my opinion that the failure to do so, in addition to the deficiencies noted above, warrants remand.  *E.g., Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir. 1990) (remanding because the ALJ "failed to advise [the plaintiff], a *pro se* claimant, that he should obtain a more detailed statement from [his treating physician]"); *Mann v. Chater*, No. 95 Civ. 2997, 1997 WL 363592 at *5 (S.D.N.Y. June 30, 1997) (Sotomayor, D.J.) ("[B]efore denying a *pro se* claimant's application, the ALJ should advise the claimant that he considered his or her case unpersuasive, and suggest that he or she produce additional medical evidence or call his or her treating physician as a witness.") (internal quotations & alterations omitted).

The ALJ's duty to develop the record in this case is all the more heightened because of Soto's *pro se* status and her relatively limited functional abilities.  On May 5, 2005, Dr. Sherman administered a standardized intelligence scale test (Wechsler-III) and diagnosed Soto with mild mental retardation.  (*Id*. at 664.)  On the test, Soto achieved a full scale IQ of 46, a verbal scale IQ of 55, and a performance scale IQ of 47.  (*Id*. at 662–63.)  In Dr. Sherman's opinion, "[Soto's] overall level of intellectual functioning [was] within the very impaired range," though she "appear[ed] capable of higher functioning."  (*Id.*)

In all, while it may be that the ALJ's June 5, 2008 decision is ultimately sustained, it cannot be sustained on the current record.  The matter should be remanded to the ALJ for further

development of the record. The ALJ should be directed to determine whether Soto received mental health, psychiatric and/or medical treatment, and from whom, from November 2004 to the date of the hearing. If such treatment was provided, the relevant records should be obtained and considered, and the ALJ should issue a revised determination. Whether an additional hearing and/or consultive examinations should be held should be left to the ALJ's discretion.

## Conclusion

For the foregoing reasons, I respectfully recommend that the Commissioner's motion be denied, and the matter be remanded to the ALJ for further development of the record. Any objections to the recommendations made in this R&R must be filed with the Clerk of the Court and the Chambers of the Honorable Sandra L. Townes within fourteen days of receiving the R&R. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 6(a), 6(e), 72; *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

**Dated: Brooklyn, New York**
       **October 1, 2010**

*Ramon E. Reyes, Jr.*
RAMON E. REYES, JR.
United States Magistrate Judge